UNITED STATES of America, Plaintiff-Appellee,

v.

Eugene Pete GARCIA, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Joe Anthony CONTRERAS and David Lucero, Defendants-Appellants.

Nos. 79–1470, 1471 and 1472.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 14, 1980.

Decided July 8, 1980.

---

David E. Booth, Federal Public Defender, East St. Louis, Ill., Russell W. Hartigan, Chicago, Ill., for defendant-appellant.

Theodore J. MacDonald, Asst. U. S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, PELL and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

Appellants Eugene Pete Garcia, Joe Anthony Contreras, and David Lucero, inmates at the federal penitentiary at Marion, Illi-

nois, were convicted by a jury of second degree murder and the illegal conveyance of a weapon within the prison, in violation of 18 U.S.C. §§ 1111, and 1792, respectively. The convictions arose out of the violent killing of Michael Martinez, another inmate at Marion, who was stabbed to death in the prison by appellants on November 6, 1978.

The essential facts are not in significant dispute. Appellants introduced testimony of Marion inmates that Martinez had threatened Garcia's life prior to the fight between the two that led to Martinez's untimely death. The inmates also testified that Martinez had started the fight by attacking Garcia with a knife. Garcia, apparently, successfully repelled the attack with the aid of Contreras and Lucero. This stage of the fight occurred behind a partially closed door, thus out of the sight of the guards who were the prosecution's main witnesses. The struggle, however, soon moved into a corridor where guards testified to seeing all three appellants chasing Martinez down the hall, catching him, and stabbing him to death while ignoring the guards' orders to stop.

At trial, appellants did not contest that they were responsible for Martinez's death; rather, they relied solely on a theory of self-defense. Garcia claimed he killed Martinez while defending himself from the original attack by Martinez, and Contreras and Lucero maintained they were merely aiding Garcia's defense. On this appeal, appellants raise a variety of complaints regarding the trial which we shall consolidate and address in turn below.

## I.

Prior to the trial, appellants obtained a court order requiring the disclosure of the Bureau of Prisons file on Martinez. At first, the Government refused to comply with the court order because it claimed the file contained nondiscoverable information,

i.e., the name of an informant. After reviewing the file *in camera*, the court agreed with the Government and ordered disclosure of the complete file except for the name of an inmate who had claimed his life had been threatened by Martinez. The trial court based its decision on Federal Rule of Criminal Procedure 16(d)(1).[1] The information regarding the threat itself was left intact and only the name of the informant was removed. Appellants claim, based upon *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), that they were denied a fair trial by being denied the name of this potential witness who might have been able to testify to Martinez's reputation for violence. The prosecution contended, and the trial court specifically ruled, on the other hand, that the threat to the informant's safety by the release of his name to other inmates outweighed the prejudice to the defense from withholding the information.

 We agree with the analysis and conclusion of the trial court. The decision of whether to release the name of an informant depends upon a careful balance of competing interests. We must weigh the need of the accused for the witness against the public interest in protecting the flow of information to the Government, *Roviaro v. United States*, 353 U.S. 53, 62, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957), and against the interest of the witness in avoiding harassment, *United States v. Hernandez-Berceda*, 572 F.2d 680, 683 (9th Cir. 1978), *cert. denied*, 436 U.S. 949, 98 S.Ct. 2856, 56 L.Ed.2d 792; *United States v. Fink*, 502 F.2d 1, 7 (5th Cir. 1974), *cert. denied*, 421 U.S. 911, 95 S.Ct. 1562, 43 L.Ed.2d 775, *and see Jimenez v. United States*, 397 F.2d 271 (5th Cir. 1968). In the present case, the threat to the well being of a named inmate-informant and the public interest in protecting the flow of this type of information to prison authorities is obvious while the competing need of the appellants for the informant's

---

1. Federal Rule of Criminal Procedure 16(d)(1) provides in relevant part:

 Upon a sufficient showing the court may at any time order that the discovery or inspection be denied, restricted, or deferred, or

make such other order as is appropriate. Upon a motion by a party, the court may permit the party to make such showing, in whole or in part, in the form of a written statement to be inspected by the judge alone.

name is relatively slight. The informant had no direct connection with the substance of this prosecution and even without the services of this prospective witness, the appellants presented substantial testimony of Martinez's reputation for violent behavior. Moreover, certain inmates testified that Martinez had specifically threatened Garcia's life and that Martinez had initiated the original altercation that eventually led to his death. The additional testimony of yet another witness could have provided no significant assistance on this issue, especially when the threat to the unnamed inmate, the central point of the relevant evidence, was disclosed. In light of the fact that the appellants have demonstrated no showing of what specific assistance the additional witness might have offered, we hold that the trial judge correctly exercised his discretion under Rule 16.

## II.

Appellants complain that during the trial, the judge left his role as impartial arbiter of legal issues and became a partisan assistant to the prosecution. Appellants cite examples where they claim the judge "led" the prosecution to and through arguments and conclusions,[2] point to the fact that the trial judge allowed Bureau of Prisons personnel to attend the *in camera* inspection of the Martinez file but denied admission to defense attorneys, and note that when allowing admission into evidence certain photographs of Martinez's body objected to by the defense, the judge stated that the photographs were relevant to the issue of "malice," a ground allegedly not advanced by the prosecution.

■ We believe the record as a whole demonstrates the trial judge's impartiality and neutrality in conducting the trial. The claimed instances of the judge's "leading" the prosecution through various arguments supporting its "position" are no more than examples of the method many trial judges follow in explaining their rulings to the parties. In the specific examples appellants cite, the judge was, in fact, explaining to the prosecution out of the presence of the jury why he was then inclined to rule against the Government's position. We refuse to find fault in the judge's offering this clarification, or in the manner he chose to explain it.

■ A similar holding is appropriate to appellants' other objections. The fact that Bureau of Prisons personnel were allowed into the *in camera* inspection while defense attorneys were excluded would seem simply an exercise of common sense. The employees were present to explain to the judge exactly what they thought should be excluded and why exclusion was required. The admission of defense attorneys would not have offered significant assistance to the trial judge as their position was explained adequately in the courtroom. The prosecution attorneys were also excluded from the inspection and a transcript of the proceeding reveals no instance of impropriety. Although the alternative of admitting the attorneys and requesting them not to reveal excised information was available, we do not regard it as necessary under the circumstances of this case.

2. An example of an objected to exchange is as follows:

> Court [to the prosecution when ruling on the motion to delete parts of Martinez's file]:
> . . . I think your point over here in Rule 16 under subsection D, Regulation of Discovery, also is meritorious. The thing that bothers me is that it says "upon a sufficient showing," and the affidavits which you have given me are conclusory, you know, they say baldly that this is exempt under the Freedom of Information Act, which, of course, United States versus Brown says it isn't.
> Now show me where someone's safety will be jeopardized. Show me a breach of confi-

> dentiality. Give me something to hang my hat on. Because otherwise I am obligated to give the entire file to these Defendants. But you have to have some position showing, some rational basis for refusing the information.
> Mr. Hursey [Government Attorney]: We understand the court's position, and we have that document here if the——
> The Court: The Court has no position. You have a position. I am merely telling you what is troubling me in trying to dispose of this question.

As to the judge's stating *sua sponte* that "malice" was a justification for the admission of the photographs, we note that the judge was ruling at the time on a defense motion to exclude the evidence on the grounds that the potential prejudice to the defendants greatly outweighed the probative value of the photographs. The trial judge was under a duty to strike this balance, and his additional step of explaining his reasoning will not be condemned. We know of no authority for the proposition that a trial judge is limited, when ruling on various trial motions, to justifications offered by the parties. While a trial may have aspects of a fencing match between the adversaries, ultimately its purpose is to establish the truth, and the district judge handled this trial accordingly, and properly.

Nor do we believe the jury was prejudiced by the judge's stating that "malice" was an adequate ground for admission. The prosecution was seeking a conviction for first degree murder, a charge which explicitly and implicitly incorporated a charge of malicious conduct, and the jury was so instructed. Absent a specific showing of prejudice, we find that the judge's remark, if error at all, was harmless.

### III.

Appellant Garcia objects to an instruction given to the jury on the issue of provocation which he contends improperly created the impression that he might have provoked the attack by Martinez. The trial judge instructed the jury:

A person who initially provokes the use of force against himself or another is justified in the use of force in defense only if the force used against him or another is so great that he reasonably believes that he is in danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger, other than the use of force which is likely to cause death or great bodily harm to the other person.

Garcia protests that there was no evidence presented at trial suggesting he provoked the dispute with Martinez, and therefore, that the issue should not have been submitted to the jury.

We believe the trial judge correctly ruled that the issue of provocation was a question of fact for the jury to consider. The Government presented eyewitness testimony that the appellants chased Martinez down a cellblock corridor before catching him, holding him, and stabbing him to death. Garcia himself testified that he obtained a knife *in anticipation* of a meeting with Martinez and that it was *he* who originally approached Martinez immediately prior to the fight. Although the defense presented inmates who testified that Martinez initiated the original fight prior to the chase, we hold that the ultimate resolution of the issue was properly a question submitted to the jury and that they were appropriately instructed.

### IV.

The appellants next object to the fact that their inmate-witnesses were required to be handcuffed while testifying before the jury. Appellants claim in essence, that the "extreme need" required in *United States v. Esquer*, 459 F.2d 431, 433 (7th Cir. 1972), *cert. denied* 414 U.S. 1006, 94 S.Ct. 366, 38 L.Ed.2d 243 (1973), before such handcuffing is resorted to was lacking in this case, and that the handcuffing destroyed the credibility of the witnesses in the jury's eyes.

It is beyond question, of course, that the trial judge has wide discretion in maintaining the security of his or her courtroom. *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); *Esquer, supra* at 443; *United States v. Roustio*, 455 F.2d 366 (7th Cir. 1972). In the present case, the trial judge held a separate hearing at which he required the Government to justify the handcuffing. The Government put into evidence the files on the prospective witnesses, the crimes they were convicted of and their histories, if any, of prior escape attempts, and concluded that the majority of the inmates were high escape risks. Based upon this information, the trial judge specifically concluded that the dan-

ger posed by the unshackled prisoners was greater than the prejudice the handcuffing would have on the defense. He ordered, however, that the inmates would not be required to raise their hands when giving the oath so as to avoid drawing the jury's attention to the handcuffs.

We believe the trial court utilized the proper procedure to reach the correct resolution to this question. His holding of a separate hearing at which the Government had the burden to justify the handcuffing was a proper application of the *Esquer* principles. Although we reaffirm that "the shackling of witnesses is an unfortunate and undesirable practice which should be employed only in cases of extreme need," *Esquer, supra* at 433, we believe such need was amply shown by the Government here. The majority of the inmate-witnesses, all of whom were incarcerated in a maximum security prison, had "extreme caution" noted on their files and most had histories of attempted escapes. To handcuff only some of the inmates well might have been more prejudicial to the defense than handcuffing them all as it likely would have wholly destroyed the credibility of the handcuffed few. The blanket order made the handcuffing appear to be normal procedure. In sum, we hold the trial judge properly and commendably exercised his discretion in this thorny situation.

### V.

■ Appellants next contend that the trial judge improperly refused to give an instruction to the jury that would have disallowed a finding of guilty on the charge of illegally conveying a weapon in the prison if they found the conveyance was in self-defense. Appellants offered no case law support for this rather unique theory at trial, but on this appeal rely upon *People v. King*, 22 Cal.3d 12, 148 Cal.Rptr. 409, 582 P.2d 1000. (En *banc*, 1978). *King*, however, is clearly distinguishable from the present case and thus offers little support for the appellants' position.

In *King*, a felon had been found guilty of violating a California law making it illegal for a felon to possess a concealable firearm. The appellant had been attending a party at a friend's house when the house came under attack from some uninvited and intoxicated individuals. During the melee, the appellant was given a small pistol from another guest to use in protecting the house and the occupants. He fired the gun over the heads of the attackers, slightly wounding one and frightening away the remainder. At trial, the judge had refused to give an instruction that self-defense would be a defense to the weapon-possession charge and the appellant appealed. The California Supreme Court, sitting *en banc*, reversed, holding that the state legislature, when passing the law making possession of a handgun by felons illegal, had not intended to deny felons the right or ability to protect themselves in circumstances such as those before the Court.

The instant case involves facts far different than those presented in *King*. Here, it is a fair inference from the evidence that the appellant Garcia did not come into a sudden, unexpected, or short-lived possession of the knife when he allegedly came under attack by Martinez. In fact, he testified that he obtained and carried the knife *in anticipation* of meeting Martinez. Similarly, the knives shown to be in the possession of Lucero and Contreras did not suddenly materialize upon the initiation of the fight, but must have been conveyed by the appellants throughout the prison for some period of time prior to the fight. To accept appellants' novel theory that the possibility of being subject to an attack justifies an inmate's walking about the prison armed with a deadly weapon would substantially destroy any semblance of security in the prison. Such a position is utterly lacking in legal or logical support and we thus decline to adopt it here. The trial court properly refused the instruction.

### VI.

■ During the direct examination of agent Stewart, the FBI agent in charge of the investigation of the Martinez murder, Stewart stated that the appellants Contrer-

as and Lucero had "declined to make any statement until they had talked to a lawyer." This statement was objected to and the trial judge promptly sustained the objection, ordered that it be stricken from the record, and instructed the jury to disregard it. Appellants contend here, however, that these precautions were inadequate to remove the potential prejudice the information may have had on the jury, and that they are therefore entitled to a new trial. We disagree.

The prosecutor had asked the witness whether he had gone to the penitentiary on November 6, 1978, and after obtaining an affirmative response asked him "Why?" After answering the question, the agent proceeded, for some two pages of the transcript, to relate a narrative of what he had done in his investigation. The challenged part of the testimony was not responsive to the question but then most of the narrative concerning the investigation was also not responsive. There is, of course, nothing particularly unusual, or incorrect, in a procedure of letting a witness relate pertinent information in a narrative form as long as it stays within the bounds of pertinency and materiality. A constant procession of questions and answers can lengthen a trial substantially, and unnecessarily.

The challenged part of this testimony, however, obviously had no proper place in the narrative. *See United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). The agent, a trained investigator, should have been aware of the impropriety. We cannot agree, however, with the "surmise" of the defense that the witness knew the testimony was improper and nevertheless stated it. There is absolutely no aspect of prosecutorial misconduct reflected in the incident and our search of the record of this fairly tried case indicates a lack of any support for an inference that in relating what he did the agent did other than simply inadvertently stray across the border of propriety while setting forth the step-by-step details of his investigation.

The appellants are apparently more disturbed by this incident on appeal than they were at the trial. The entire colloquy immediately following the utterance is as follows:

> Mr. Booth: Objection, Your Honor.
>
> The Court: Sustained.
>
> Mr. Booth: We ask that that be stricken.
>
> The Court: Yes, it is stricken. The Jury is instructed to disregard it.

There was no motion for a mistrial nor have counsel pointed out any further reference whatsoever in the record to the statement. The matter of silence was not adverted to in cross-examination of the defendants for impeachment or any other purpose, nor was there any reference to the matter in final arguments or elsewhere in the record. It remains an isolated incident in a transcript of more than 500 pages. Upon the reference occurring, it was immediately and decisively removed from the case. Under these circumstances, we have no difficulty in holding that there was no reversible error in this ephemeral reference.

The Government alternatively argues that even if the reference was error it was beyond doubt harmless error. In *Doyle v. Ohio*, 426 U.S. 610, 619–20, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976), the Supreme Court appears to have left open the question of the applicability of the doctrine of harmless error in situations such as the present one. We do not need to address that issue because of the reasons we have stated above, but it if were necessary to do so we would have no hesitation in determining that under all of the circumstances of this case it would be appropriate to sustain the trial court on the basis of harmless error.

## VII.

Appellants next contend that there was insufficient evidence to convict them of the crimes. They complain that the Government failed to present any evidence disputing the defense witnesses' testimony that Martinez initiated the fight between himself and Garcia and that Lucero and Contreras subsequently joined to help Garcia. They point out that none of the prosecu-

tion's witnesses could see the beginning of the fight which occurred behind a partially closed door. They conclude, therefore, that their evidence of self-defense stood unrefuted.

While it is true that the prosecution's witnesses could not see the origin of the altercation between Garcia and Martinez, appellants ignore the numerous prosecution witnesses who personally saw the later stages of the fight, the stages where the appellants were seen chasing Martinez down the corridor and catching him and holding him down while they stabbed him 47 times. Whatever the origin of the fight, it is clear to us as it apparently was to the jury that when the appellants began to chase Martinez down the hall to kill him, they were no longer acting in self-defense. That justification for their conduct ceased when they became the aggressors. The cause of the original fight became largely irrelevant when the chase began and we hold there was ample evidence justifying the jury's verdict.

### VIII.

Appellant Lucero lastly claims he was denied effective assistance of counsel at trial. He claims the record shows his trial attorney was "less than zealous" in his defense and cites as examples his counsel's decisions to "waive" opening statement, not to cross-examine certain Government witnesses, and not to put Lucero on the stand in his own defense.

This court made it clear in *United States ex rel. Williams v. Twomey*, 510 F.2d 634 (7th Cir. 1975), *cert. denied*, 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109, that there is no presumption of inadequate representation "merely because defendant's attorney . . . makes egregious errors, tactical or strategic, in preparation, in conference, in examining witnesses, or in not investigating or calling potential witnesses." *Id.* at 640. Rather, the burden is upon the defendant to defeat the presumption that the attorney was conscious of his or her duties to the client and that he or she sought conscientiously to discharge those

duties. *Matthews v. United States*, 518 F.2d 1245, 1246 (7th Cir. 1975), *see also United States v. Fleming*, 594 F.2d 598, 606–607 (7th Cir. 1979), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299, *United States v. Krohn*, 560 F.2d 293, 297 (7th Cir. 1977), *cert. denied*, 435 U.S. 895, 98 S.Ct. 275, 54 L.Ed.2d 182. The ultimate question is not whether the representation was "zealous" or might have been better; rather, it is whether it met minimum professional standards. *Williams, supra* at 640.

In the present case, the record amply demonstrates that Lucero's trial counsel met the minimum professional standards. He did not waive opening statement; rather, he simply delayed making the statement until after the prosecution had closed its case-in-chief and the defense had begun its presentation. We would be surprised if many counsel would not welcome this opportunity. The few times Lucero's attorney waived cross-examination of a prosecution witness occurred only after both Garcia's and Contreras' attorneys had cross-examined the witness and further questioning could scarcely have failed being repetitive. Lastly, the attorney's decision not to put Lucero on the stand might or might not have been well founded given the potential production of Lucero's criminal record. Regardless of the wisdom of the decision, however, it, like the decision not to press the cross-examination of a witness who had difficulty identifying Lucero in court, is the sort of tactical decision we will not second guess. *See Fleming, supra, and Krohn, supra.* There are few trial counsel of any experience who have not regretted continued pursuit of cross-examination on a subject which has developed favorable aspects for the client. In sum, especially lacking any indication by Lucero as to how his position would have been improved had his attorney made these tactical decisions differently, we reject that the representation provided him at trial fell below minimum professional standards.

For the reasons stated above, the decision of the trial court is

AFFIRMED.